

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| SONNY CONTRERAS, | § | No. 08-23-00210-CR and 08-23-00211-CR |
| Appellant, | § | Appeal from the |
| v. | § | 109th District Court |
| THE STATE OF TEXAS, | § | of Winkler County, Texas |
| Appellee. | § | (TC# DC23-6091 and DC23-6101) |

# **O P I N I O N**

A jury found Appellant Sonny Contreras guilty of one count of felony murder and one count of injury to a child by omission in the death of his seven-month-old son.[1] The jury sentenced Contreras to 42 years' confinement for felony murder, with injury to a child by act as the predicate felony, and 30 years' confinement for injury to a child by omission. The trial court ordered the sentences to run concurrently. We affirm the judgment of conviction for felony murder, but because we conclude the evidence is legally insufficient to support Contreras's conviction for injury to a child by omission, we reverse and render a judgment of acquittal as to that offense.

---

[1] Today, we issue two opinions stemming from the single trial in which Contreras was tried on both counts. The present opinion is an appeal of the felony murder conviction in cause number DC23-6091 and the companion opinion is an appeal of the injury-to-a-child-by-omission conviction in cause number DC23-6101.

# I. FACTUAL AND PROCEDURAL BACKGROUND

The victim in this case, K.C., was born on July 11, 2019, in Carlsbad, New Mexico to Contreras and his then-girlfriend, Samantha Lulaks (Samantha). K.C. suffered life-threatening injuries on March 1, 2020, and died two days later at a trauma center in Lubbock, Texas from what medical personnel diagnosed as abusive head trauma.

Contreras was originally indicted by a grand jury in 2020 for reckless injury to a child. He was later reindicted in 2021 and again in 2023 for felony murder. The 2023 indictment, for which he stood trial, alleged that on or about March 1, 2020, he

> committed or attempted to commit the felony offense of injury to a child, by intentionally, knowingly, recklessly, or with criminal negligence, causing serious bodily injury to [K.C.] a child younger than 14 years of age, by striking the head of [K.C.] with a blunt object, by causing the head of [K.C.] to strike a blunt object, or by causing the rapid acceleration and deceleration of the head of [K.C.], and while in the course of and in furtherance of the commission of said felony offense [Appellant] committed or attempted to commit an act clearly dangerous to human life, to-wit: striking the head of [K.C.] with a blunt object, causing the head of [K.C.] to strike a blunt object, or causing the rapid acceleration and deceleration of the head of [K.C.] which caused the death of an individual, namely [K.C.].[2]

In a separate 2023 indictment, Contreras was charged with one count of "knowingly, by omission, caus[ing] serious bodily injury to [K.C.] a child 14 years of age or younger, by failing to seek medical care for [K.C.] in a timely manner, and [Contreras] as a parent of [K.C.] had a legal duty to act pursuant to Section 151.001 of the Texas Family Code."

## A. Events leading up to March 1, 2020

At trial, Samantha testified that she and Contreras met while they were working at a Pilot store in Carlsbad, New Mexico. At some point, Contreras was terminated from his position and Samantha was promoted and transferred to another Pilot store in Kermit, Texas. The three moved

---

[2] The 2023 indictment also charged Contreras with two other offenses, Injury to a Child (reckless) and Injury to a Child (intentional/knowing). The State later dismissed those two charges prior to trial.

into a four-bedroom trailer in a Pilot employee complex in Kermit the weekend of February 7, 2020. Contreras was responsible for watching K.C. while Samantha worked.

Samantha described K.C. as a healthy and normal infant.[3] The State provided records of his various well-baby medical visits demonstrating K.C. had no significant health issues, including his six-month checkup, one month before his death.

Samantha recalled that K.C. appeared to be normal the weekend they moved to Kermit, but shortly thereafter, K.C. was fussy, had a fever, and was vomiting. She took him to Winkler Memorial Hospital on February 12, 2020, where he had a normal neurological exam and his heart was normal. K.C. had a temperature of 100.2 and nasal congestion. He tested negative for any signs of infection and was discharged with a viral syndrome diagnosis and instructions to receive Tylenol, ibuprofen, and Pedialyte. The next day after work, Samantha observed that K.C. had a hurt lip. Appellant told her K.C. had hit himself with a toy.

Shortly thereafter, on February 15, 2020, Samantha's mother (Lisa) came to visit the family. Lisa testified that she had visited the family in Carlsbad after K.C.'s birth and video-chatted with Samantha and K.C. on a regular basis. She described K.C. as a "very chill" baby but observed that he seemed fussy during her visit that week. When Samantha picked her up at the Midland airport, Lisa recalled, Samantha told her K.C. had diarrhea and had been vomiting. They decided to take K.C. to a Midland hospital where he again tested negative for any signs of infection and was diagnosed with a viral syndrome. He had a normal neurological examination, was "alert and

---

[3] K.C.'s medical records indicate that at birth, he had three issues, including head "molding," a heart murmur, and a condition called "cephalohematoma," which was described as "a collection of blood and fluid in the scalp or under the scalp between the skull and the surface of the skin" that occurs when the baby's head is "smooshed" in the birth canal. Medical testimony established, however, that these conditions were all normal in newborns and that all of the conditions had resolved well before K.C.'s death. The State presented the medical records from K.C.'s well checkups, which indicated he no longer suffered from molding and his pediatrician no longer heard any heart murmurs. In addition, the medical examiner who conducted K.C.'s autopsy pointed out that K.C.'s heart was harvested for donation, which would not have been the case if the heart had any congenital defects.

responsive," and had no detected heart murmurs. A chest x-ray confirmed his heart was normal. After providing him with a sodium chloride IV, K.C. was discharged with instructions to receive Tylenol and Pedialyte, and follow up with his primary care physician or return to the emergency room if his symptoms worsened.

During her week-long visit, Lisa noted that K.C. was attached to Samantha but seemed afraid of Contreras and clung to Lisa when Contreras approached. She was concerned about K.C.'s lip injury but believed Contreras's explanation. While she was there, Lisa explained, K.C. got four teeth, which could have accounted for why he was not feeling well. Samantha said that after Lisa left on February 22, K.C. continued to improve.

Two days before K.C. was injured, Samantha recalled, Contreras was upset and began to accuse her of cheating because she was not answering her phone while at work. Text messages Samantha provided from Contreras that day while she was working stated:

- Plz don't cheat on me.

- Who is he, Sami? Obviously fixing your attention on someone else.

- What if something happened to [K.C.] and I kept calling you but you wouldn't answer my calls huh dont you care

The next day (Saturday, February 28) Samantha was off work and the family went shopping in Midland. K.C. was not vomiting, did not have a fever, was holding food down, and generally seemed fine, other than being a "little tired."

## B. Events of March 1, 2020

### (1) Samantha's testimony

Samantha testified that she was off work on Sunday, March 1, 2020, and woke up at 8:00 or 8:30, along with K.C., who had been sleeping next to her. While Contreras was still sleeping,

4

she took K.C. into the guest room, fed him around 8:30 or 9:00, turned on Sesame Street, and FaceTimed with Lisa.[4]

When Contreras woke up, Samantha told him she was going shopping and left K.C. in the guestroom propped up on a "boppy pillow" at either 11:00 or 11:30 a.m.[5] According to Samantha, K.C. was not crying when she left, and nothing was wrong with him. The State presented a video and still shots from Samantha's shopping trip, indicating that she entered the store at 11:22, checked out at 12:31, and left the store at 12:33.

Samantha testified, and her phone records confirm, that she tried to call Contreras at 11:48 a.m. during the shopping trip, but he did not respond. She placed her phone in the hoodie she was wearing. Unbeknownst to her, Contreras had been trying to call, but because her phone was on vibrate, she did not answer. A call log the State introduced showed that Contreras began calling Samantha at 12:16 p.m., with eight missed calls through 12:33 p.m. Contreras also began texting Samantha at 12:22, stating: "[K.C.] is dying. Hurry up. I called 91w [sic]." Unaware of the text, she continued shopping. While checking out, she heard her phone vibrate and immediately called Contreras back, whereupon a deputy came on the line, told her that her son was at the hospital, and asked her to meet them there.

Contreras sent her the following text messages, starting at 12:33 and ending at 12:36:

- "Sami where are you"

- "Your cheating on me and you don't care about [K.C.] you liar!!!"

- "Why the fuck wouldn't you answer cuz you were with a guy I hate you"

- "[K.C.] is dying and that's all you care about"

---

[4]  Lisa testified at trial that while they were FaceTiming, K.C. appeared "a little cranky," but she did not find it unusual as he had just woken up. K.C. seemed "responsive" to her, and she did not believe anything was wrong with him at the time.

[5]  The record contains a photo of one of K.C.'s "boppy pillows," which is a u-shaped pillow that can be used for nursing and bottle-feeding infants. *See* https://www.boppy.com.

Contreras was already at the hospital when Samantha arrived. He informed her that K.C. had been choking and they were intubating him. However, she later learned from hospital staff that nothing had been blocking his airway, so he could not have been choking. Samantha was able to see K.C. before he was airlifted to University Medical Center (UMC) in Lubbock, and she observed him unresponsive. Samantha and Contreras drove to Lubbock. Upon arriving, the UMC doctors were performing tests and had determined K.C.'s injuries were trauma related. Samantha testified that while they were at the hospital in Lubbock, Contreras claimed K.C. hurt himself in his bouncer, which she thought sounded "crazy." At that point, Samantha began to suspect Contreras was responsible for K.C.'s injuries. At trial, she expressly denied she did anything to harm her child.

### (2) First responders' testimony

Contreras's phone records indicate that he unsuccessfully tried to call Samantha on her cell phone beginning at 12:16 p.m., and called 911 three minutes later, at 12:19 p.m. In his 911 call, which was played for the jury, Contreras reported his baby was "not breathing" and he had been trying to perform CPR.

### (a) Winkler County Sheriff Deputy Rebekka Cogburn

Rebekka Cogburn, a deputy from the Winkler County Sheriff's Office, was first to respond. She testified that she received the 911 call at 12:25 and was at the housing complex with lights and sirens at 12:27.[6]

When she arrived, an EMS vehicle was in the parking lot trying to locate the residence.[7] No one came out of the residence at first, but eventually Contreras emerged waving his arms. Upon entering the residence, she found K.C. laying on his back on a sofa with his eyes closed. He was

---

[6] Cogburn's dashcam video was also played for the jury.

[7] It appears that Appellant provided the wrong pod number during his 911 call.

"chilled," his "lips were blue," and he had "lost color" and was "very pale." Although Contreras later informed Cogburn that K.C. had been choking while bottle-feeding, she neither observed a bottle anywhere nor anything in K.C.'s airway. She observed no signs of vomit on the couch where K.C. was laying or on his clothes.

Cogburn performed CPR until paramedic Fred Meyers entered the residence and took over. While K.C. was being treated by Meyers, according to Cogburn, Contreras was "cussing" as he was unsuccessfully trying to call K.C.'s mother.

### (b) Winkler County Paramedic Fred Myers

Meyers, a nationally registered EMT and licensed paramedic employed by Winkler County EMS, testified that he received the call that an infant was not breathing at 12:24 p.m. and arrived onsite at 12:29. He and his partner had trouble locating the residence, and although they arrived with lights and sirens, Contreras did not come out for a few minutes.

Meyers recalled that when he first entered the residence, Cogburn was performing CPR on K.C. and he immediately took over. K.C. did not have any obvious signs of trauma, but he described him as "pulseless and apneic" (not breathing). Meyers also recalled K.C. was "cold to the touch," "pale," and "very cyanotic," with blueness of the lips, nail beds, and eye area, which he explained indicated a person "not been breathing for a while" and was "becoming hypoxic" due to a low concentration of oxygen in their blood. He explained it is difficult to estimate how long it might take to become cyanotic but noted that it could be "minutes."

At the scene, Meyers and his partner spoke with Contreras, who relayed that K.C. had been choking. They made the following written report:

> Father of patient informs EMS that his baby had been congested for a couple of days. While feeding his son milk and oatmeal, he observed what the father claimed as the baby choking. The father noted the patient going unresponsive, and that's when he called 911.

7

Meyers, however, testified that he did not see any indication of choking, and the "child had a very clear airway." Meyers did not see "any indication of food in the child's mouth or airway or on his clothes," which struck him as odd, as food typically comes out if a patient has cardiac arrest. He opined that K.C. did not have any food in his stomach at the time.

Meyers recalled that he and his partner departed Appellant's residence at 12:31 and performed continuous CPR on K.C. during the transport, arriving at the Winkler County Memorial Hospital at 12:34 p.m. After EMS took K.C. in the ambulance, Cogburn transported Contreras to the hospital in her unit. While in the unit, she testified, Contreras was eventually able to contact K.C.'s mother, but because he was cursing and yelling at her, she took the phone from him to brief her and advise her to meet them at the hospital.

At the hospital, Contreras provided a written statement to Cogburn and her partner, Spence, again claiming K.C. had been choking, but adding that he believed K.C. had suffered a seizure and a small amount of milk came out of his mouth and nose while he was performing CPR. Cogburn read Contreras's statement to the jury:

> On the 1 day of March 2020, at or about 12:16, a.m. [sic], I was feeding him like usual with his bottle. We usually put 8 ounces of water and mix it with oatmeal for babies. Sometimes we put a little bit of chocolate milk. I was next to him watching TV and he started choking. I got scared so turned him around and started to pat him on back holding my hand under stomach and he started . . . like what it seemed to be a seizure. I carried him to couch laid him flat. I put my finger in between his teeth so he wouldn't bite his tongue and he would breathe slow and big for a little bit but without any function. I pressed down -- down on his stomach a little and milk came out of his mouth and nose. So I got scared and called the police -- looked like he stopped breathing. So I gave him CPR and I was doing that milk kept coming out his mouth -- out his nose twice he would breathe one or twice, so I didn't stop while two cops got there.

### (3) Treatment at Winkler County Hospital

Bryan Bautista, an emergency room nurse, was the first person to triage K.C. at the hospital on March 1. Bautista testified that he also saw K.C. in the emergency room during his February 12

8

visit, recalling the baby suffered from nonlife threatening viral-type symptoms and he performed a neurological examination of the baby, which yielded a Glasgow Coma score of 15—the highest possible score—meaning he was neurologically sound and had no signs of trauma. However, when he encountered K.C. in the emergency room on March 1, K.C. had a Glasgow Coma score of 3—the lowest possible score. Bautista observed K.C. "lifeless and nonresponsive" and "darkish blue." K.C.'s pupils were fixed and dilated with no reaction to light. Bautista recalled K.C.'s temperature was significantly low, at 91.3 degrees Fahrenheit, on arrival. Bautista placed a nasogastric tube through K.C.'s nose into his stomach, observing processed blood in his stomach where he "ingested blood," which he explained was consistent with internal injuries.

An emergency room physician was able to intubate the baby and found no sign of airway obstruction. They were able to stabilize K.C. They stopped CPR upon achieving "spontaneous circulation." However, they were still required to continue with "manual bag valve ventilation" to maintain his breathing, as they did not have a "machine."

### (4) Contreras's statements at UMC

Because Winkler County was unable to provide K.C. the necessary level of care, at 2:08 p.m. he was airlifted to the pediatric intensive care unit at University Medical Center in Lubbock.

One of K.C.'s treating physicians, Dr. Thivakorn Kasemsri, testified that upon admission to UMC, he and his staff received a patient history from K.C.'s "caretaker." The narrative they recorded indicated that Contreras was no longer claiming that K.C. had been choking, but claimed for the first time K.C. had vomited.[8] Subsequently during a patient consultation on March 2 or 3,

---

[8] The narrative stated:

> 7mo previously healthy with URI x 2 weeks who went to bed well last night and woke up normally. Mother fed him and he took the feed as usual. She placed him on infant Boppy pillow in front of the TV and left him with father to go to the grocery store~11:00. Subsequently, his father saw him whining and thought he was hungry and fed him again. Father picked him up to burp him and he began to vomit and went limp. His eyes rolled back and he went limp. Father tried to splash water

9

2020, Contreras provided an additional narrative, this time claiming K.C. suffered a seizure but omitting any reference to K.C. having choked or vomited.[9]

## C.   Treatment at UMC and testimony from the UMC physicians

At UMC, K.C. was seen by both Kasemsri, who practices pediatric intensive care, and Dr. Usiakimi Igbaseimokumo, a board-certified specialist in pediatric neurosurgery specializing in treating traumatic brain injuries in children. Igbaseimokumo testified that he reviewed K.C.'s brain scans and found them "alarming," showing swelling and hemorrhaging in the brain, with K.C.'s brain appearing to be dying (i.e., losing gray and white matter and becoming "dark and mushlike") due to the lack of oxygen to the brain (hypoxia) and lack of blood flow (ischemia). He attempted to relieve the pressure on K.C.'s brain by draining the fluid, but K.C. remained unresponsive. According to Igbaseimokumo, the blood in his brain was fresh, indicating an acute and severe injury, requiring "a hard, high, severe force" to inflict.

Both he and Kasemsri agreed that, based on their review of CT scans and MRI imaging, K.C. suffered from subdural and subarachnoid brain hemorrhages, hemorrhaging of the ligaments of the spine, and retinal hemorrhaging, all of which they opined was consistent with the rapid acceleration and deceleration of the head and neck, commonly referred to as "shaken baby

---

on him without response. He was gasping some and had began [sic] to have cyanosis around his lips. Father began rescue breathing [until paramedics arrived].

[9] The narrative stated:

Father states that patient has "been sick" for the last 3 weeks and has been more fussy/spitting up more than usual. He was in his usual state of health on 3/1/2020 until his noon time feed. Father states he placed him sitting up in his boppy pillow on the ground when he noticed the patient gagging. He then picked up the infant and started to burp him because "I thought he was gassy." It was then the father noticed the patient "start to seize and his eyes started rolling to the back of his head and he went limp." The father states that he then placed his finger in the infants mouth to prevent him from choking "and he bit down really hard." The father then noticed the child to be "limp and turn blue." He then placed him on the couch where he started to perform rescue breaths where the child "would turn pink then blue again, so I kept giving him CPR and called [Samantha] when he didn't keep breathing." He states that this incident started at noon and he called [Samantha] at 12:33 p.m. and then [called] EMS.

10

syndrome." Kasemsri explained that when a baby is shaken, which he described as an "acceleration-deceleration mechanism," the "brain is sloshing in [the baby's] head," and given the size of an infant's head in relation to his body, the neck and spine also have a chance of being injured, which was the case with K.C. Thus, he believed that although K.C.'s injuries could have been caused by a combination of shaking and blunt force trauma, given K.C.'s neck and spinal injuries, blunt force trauma alone could not have caused them. In addition, Igbaseimokumo explained that choking would not likely cause the type of brain, spinal, or retinal hemorrhaging that K.C. suffered; instead, these hemorrhaging events as well as the swelling in K.C.'s brain were injuries associated with "shaking" a child.

Dr. Patti Patterson, a UMC physician board certified in general pediatrics and child abuse pediatrics, did not treat K.C. but testified at trial that she reviewed K.C.'s medical records. Based on the constellation of injuries, she concluded K.C. suffered from "inflicted trauma," which could have been caused by blunt force trauma, "shaking," or both. In particular, Patterson found it significant that K.C. had ligament injuries in his neck, which was consistent with rapid acceleration and deceleration of the head.

On March 3, 2020, two days after his admission to UMC, K.C. was declared brain dead. He was removed from life support that afternoon, and his organs were harvested for donation.

**D. Autopsy results**

Dr. Tasha Greenberg, the Deputy Chief Medical Examiner for the Tarrant County Medical Examiner's Office, performed an autopsy. Based on K.C.'s medical records and her autopsy findings, Greenberg determined K.C. suffered from head and neck injuries, and the cause of death was homicide. She observed "no congenital anomalies" or "birth defects" contributing to K.C.'s death. Greenberg observed that K.C.'s organs had been harvested for transplant, including his heart, which ruled out any heart abnormalities. Greenberg further observed "normal occipital skull

development with no fractures." She ordered genetic testing and found no "clinically significant variants in those genes" that could have contributed to his injuries.

Greenberg noted evidence of swelling inside K.C.'s brain, a subdural hemorrhage of the brain (or blood in the subdural space in the brain), hemorrhaging in the spinal cord and cervical nerve root, a subarachnoid hemorrhage of the brain, and retinal hemorrhaging. Greenberg ruled out the possibility that K.C.'s injuries resulted from choking, as one would not expect to see such hemorrhaging from a choking incident. She also ruled out an aneurysm, a stroke, and that K.C.'s prior health issues in the weeks leading up to his death could have caused his symptoms, opining that his illness and subsequent recovery and behavior "does not fit with the level of these injuries that ultimately led to [his] death." According to Greenberg, the only remaining possibilities were blunt force trauma to the head, rapid acceleration and deceleration of the head or neck (violent shaking), or a combination of the two. She indicated that, of the two, "shaking as a mechanism is the more common way that we see those" types of injuries occur, noting there was no skull fracture of any kind.

Greenberg submitted her findings at a formal conference with a group of doctors called a "critical case review." The consensus from the review was that K.C.'s death was a homicide and that he died as the result of head and neck injuries, as documented in Greenberg's autopsy report.

### E. Testimony regarding the timing of K.C.'s injuries

At trial, Appellant argued that K.C.'s injuries did not necessarily occur when he had sole access to the child and that they could have occurred before Samantha left that morning. Although at trial, the medical witnesses agreed K.C's injuries resulted from abusive head trauma, they did not all agree on when the trauma occurred or when an individual in K.C.'s situation would have become symptomatic. Due to the fresh blood in K.C.'s brain, Igbaseimokumo testified, the "injury that caused that blood to occur was within hours . . . to days of the impact or of the original injury."

12

Given K.C.'s severe brain deterioration on admission, he believed the injuries likely occurred at least six to 24 hours before he was admitted. He acknowledged, however, that depending on the severity of the injury, K.C. could have become symptomatic in a much shorter time span.

Disagreeing with Igbaseimokumo, Patterson opined that children with the type of injuries K.C. suffered "almost always become immediately symptomatic"; they will display symptoms such as seizures, very often stop breathing, and may suffer from "acute decompensation." She believed this does not take "hours" to occur, rather it occurs "very, very quick[ly]." Patterson confirmed, however, her inability to pinpoint with certainty exactly when K.C.'s injuries occurred.

Acknowledging that "opinions vary between doctors," Kasemsri agreed with Patterson that depending on the severity of a child's injuries, the child could display symptoms such as having fixed and dilated pupils almost "instantaneous[ly]." Kasemsri believed that an infant with K.C.'s injuries would appear "moribund," or near death, and would not be acting "normally" after the injuries were sustained.

Finally, Greenberg opined that K.C. would have become symptomatic "at or very near the time of the injuries," i.e., "immediate[ly]." Had K.C. been injured earlier in the morning, she opined, he would not have been "acting normally" and would not have been able to take a bottle, watch television, or "interact[] on a FaceTime call." She explained that in cases of a significant head injury that ultimately leads to death, there can be a variety of symptoms, such as the immediate loss of consciousness, vomiting, and seizures, all of which "could present . . . very rapidly." She noted that a significant loss of temperature, such as K.C.'s, could occur in less than an hour in a case of severe injuries.

### F. The CPS interview

Medical personnel at UMC contacted Child Protective Services (CPS) after examining K.C. In a recorded interview, which was played for the jury, two CPS investigators, Luis Ojeda and Lillian Peña, interviewed Contreras at the hospital on March 3, 2020. The interview is in two parts, as it was interrupted when Contreras left after he received a text saying they were taking K.C. off life support. It resumed 40 minutes later upon his return.

In the first part of the interview, Contreras maintained that neither he nor Samantha had ever been physically abusive toward K.C., describing K.C. as a "healthy," "good," and "very happy" baby. Although K.C. seemed fine the day before, he reported that K.C. seemed to be "fussy" and "really sick" when Samantha left for the store the morning of March 1. Believing he might be hungry, Contreras gave K.C. a four-ounce bottle of "Similac, oatmeal and a little bit of chocolate milk," a combination he frequently gave K.C.

According to Contreras, K.C. started to vomit and his stomach felt "bloated," so Contreras started to burp him. He then reported that K.C. began to "tense up," and he believed K.C. was having "a seizure" and bit down on his tongue. Contreras said he put his finger in K.C.'s mouth to prevent him from biting his tongue off, and while holding him, K.C. went "limp" and stopped breathing.

Sharing his phone log with the investigators, Contreras explained that he immediately tried to call Samantha, thinking she could come home and take them to the hospital, as she had their only car. But when she did not answer, he called 911. Contreras reported that he also began performing CPR to try to revive K.C., and while K.C. initially responded, he then "all of a sudden . . . started turning blue." According to Contreras, the ambulance arrived shortly thereafter, and he ran outside to greet the paramedics who took over K.C.'s care.

14

In the second portion of the interview, after K.C. had passed away, Contreras changed his statements regarding Samantha, and began to broach the idea that Samantha might have been responsible for K.C.'s injuries, asserting for the first time that Samantha had "anger issues" and seemed to become more easily frustrated with K.C. since they moved to Kermit. However, he acknowledged that he never saw Samantha physically discipline or harm K.C.

When asked if Samantha could have done something to K.C., Contreras said he "didn't know" but she was the only other person who had watched K.C. since they moved to Kermit, and all he knew was he "didn't do it." Contreras also said he had been told by the UMC doctors that K.C.'s injuries could have occurred up to three days before he became symptomatic, and he therefore questioned whether K.C. could have been injured before Samantha left for the store that morning, claiming she left in a hurry and was abrupt while K.C. was fussy and crying that morning. When the investigators posited that it was either Samantha or him who hurt K.C., he acknowledged that it could have been Samantha, claiming he would never have hurt K.C. However, when the investigators informed Contreras of the doctors' belief that K.C. suffered a brain bleed from being shaken, Contreras stated for the first time that after K.C. went limp, he did "shake him to see if he would respond."

During the second portion of the interview, Contreras reported for the first time that his phone battery was dead when K.C. first became symptomatic and that he had to charge it before he could call Samantha and/or 911. Contreras estimated that K.C. stopped breathing around 12:00 or 12:10 p.m. and that he did CPR for ten minutes while his phone was charging and while he was attempting to call Samantha, before he called 911.

## G. Winkler County Sheriff's Office's investigation

On March 2, 2020, the Winkler County Sheriff's Office opened a criminal investigation after being informed that K.C.'s injuries may have been caused by "shaken baby syndrome." The

chief investigator, Deputy Leon Stroud, went to Samantha and Contreras's residence on the evening of March 3 after returning from Lubbock following K.C.'s passing. When they arrived, Samantha and her mother, Lisa, were there. He interviewed both of them.[10]

Because Samantha had already told Contreras he needed to move out, Contreras arrived shortly thereafter to collect his belongings. He told the deputy he intended to stay with his brother in Orla, Texas. According to Stroud, Contreras did not seem upset like the other family members. He told Stroud he was collecting his video games so he would not be "bored" at his brother's house. Concerned about Contreras leaving town, Stroud asked him to come to the station for an interview. He agreed. The deputy acknowledged he did not "secure" the residence before leaving.

### (1) Winkler County Sheriff's Office's interview

During the recorded interview, which was played for the jury, Contreras reported a similar series of March 1st events as he had relayed to the CPS investigators. He again reported that K.C. was crying when Samantha left for the store and appeared "sick" and "cranky." Contreras said that while attempting to give K.C. a bottle, K.C. threw up, then while burping him, K.C. had a "seizure," went limp, and stopped breathing. When Stroud asked Contreras if he thought K.C. had been choking (as Contreras had originally reported), Contreras did not respond. Instead, he stated: "Well, he had a seizure." Contreras repeated his claim that he could not call for help immediately because his phone battery had died and that he had to charge it before calling. He said he called Samantha first about ten times before he called 911. According to Contreras, he was performing CPR the entire time. He again repeated that he shook K.C. "a little" to try to revive him.

---

[10] Stroud reported that when he first arrived at the residence, Samantha's mother believed he was there because she had choked Contreras when they were at the hospital in Lubbock.

16

Contreras denied harming K.C., and when confronted with Stroud's statement that it had to have been him or Samantha, Contreras said he did not want to think it was Samantha because he loves her, but she did have a "bad temper." Contreras maintained that he "never gets angry."

### (2) Testing of Contreras's cell phone

Texas Ranger Phillip Breeding became involved in the case shortly thereafter. At Breeding's request, Contreras provided his cell phone for the purpose of determining whether his phone had been dead and needed to be charged before he could call for help when K.C. became symptomatic. Breeding gave the phone to Keri Kagawa, a criminal intelligence analyst with the Texas Attorney General's Office, who testified that based on the "device event history," Contreras's phone was never powered off on March 1, 2020. He provided a comprehensive phone log of the various events that occurred that morning, beginning at 11:36 a.m., noting that although there was "passive activity" on the phone during that time with incoming messages, 12:16 p.m. was the first "user-directed" activity. This user-directed activity consisted of a series of calls to Samantha followed by a 911 call at 12:19 p.m. and subsequent text messages to Samantha.

Breeding acknowledged that he did not obtain Samantha's phone for testing, explaining that she allowed him to view her messages and call log and he determined her phone "was of no evidentiary value." In addition, Cogburn explained that Samantha was not considered a suspect at the time because Contreras had been home alone with K.C. when he became symptomatic, and she believed the medical evidence demonstrated that his symptoms would have manifested immediately after he was injured. But Cogburn did obtain video footage from the store where Samantha had been shopping to verify the timeline during which she claimed to be away from the home.

### (3) Search of the family residence

On March 4, 2020, Cogburn and Stroud returned to the residence to conduct a search and take photographs. Cogburn testified that she looked for but was unable to find the bottle Contreras claimed he had been using to feed K.C. when the baby began choking. She also collected the clothes K.C. was wearing when he was transported to the hospital, which included a red onesie with a Nike emblem and white socks. She sent them to a crime lab in El Paso for testing.

### (4) Initial DNA testing of K.C.'s clothing

Jessica Gonzales-Peña, an employee of the Texas Department of Public Safety Crime Laboratory in El Paso testified that she received the red onesie and white socks in an evidence bag on September 19, 2020. Gonzales-Peña reported that the items tested "presumptive positive" for the presence of blood, and she forwarded them to Christine Ceniceros, a DNA analyst at the crime lab, for testing.

Ceniceros testified that she received the above-described items for testing and obtained a blood card from K.C. and buccal swabs from both parents. Ceniceros concluded that the red onesie and the socks had a DNA mixture belonging to K.C. and another individual. She excluded the possibility that the other individual's DNA belonged to Samantha, and established that it was 93% more likely to be Contreras's DNA than another unrelated unknown individual.

### (5) Collection of additional clothing and further DNA testing

Although K.C. was wearing the red onesie when he was transported to the hospital, at some point, Samantha recalled that K.C. had been wearing a gray onesie with black trim which also bore a Nike emblem when she left for the store on March 1. Unbeknownst to Samantha, the gray onesie was in a laundry hamper in K.C.'s room, along with a black tank top belonging to Contreras. Because she was emotionally unable to sort through K.C.'s things following his death, approximately six months later when she decided to move to Ohio, her father and stepmother came

from Carlsbad to pack up K.C.'s things, including the clothing in the hamper. Tricia Soals, Samantha's stepmother, testified that, at Samantha's request, she did not wash any of the dirty clothes in the hamper. In March 2023, she was asked to provide the items from the hamper to law enforcement.

Cogburn testified that she collected the items from Soals at her home in Carlsbad and sent them to the crime lab in El Paso for DNA testing.[11] Gonzales-Peña testified that she tested the gray onesie in May 2023, but it was negative for blood stains. However, the black tank top was positive for possible blood stains in four spots.[12] Ceniceros conducted DNA testing on the stains and determined that two belonged solely to K.C. and the other two had DNA from both K.C. and Contreras. She excluded Samantha as a contributor to any of the four stains.

## H. Contreras's defense

Contreras did not call any witnesses at trial. During opening arguments and cross-examination of various witnesses, defense counsel focused on other possible causes for K.C.'s injuries, including his illness in the weeks before his death.[13] During closing argument, however, defense counsel conceded that "[n]obody is disputing that there is abusive head trauma" and "[t]hat's what the evidence shows." But he argued there was insufficient evidence to establish Contreras inflicted the injuries. He conceded that Contreras was alone with K.C. when he became symptomatic, but he pointed to Igbaseimokumo's testimony that he believed K.C.'s injury

---

[11] When she conducted her initial investigation into K.C.'s injuries, Stroud testified, she was not aware that K.C. had been wearing a different onesie before Samantha left for the store.

[12] Gonzales-Peña was also given two other socks, a blanket, and a boppy pillow cover that Soals had retrieved from the residence, which all tested negative for any blood stains.

[13] At trial, defense counsel also questioned the medical witnesses about a finding in a pathologist report that K.C. had an amino acid that was consistent with being a carrier of "Canavan disease," a rare genetic disease that affects the brain's white matter and causes severe complications and early death. However, both Greenberg and Patterson testified that they did not find any evidence that K.C. suffered from Canavan disease, and that his injuries and symptoms were not consistent with a finding that he died as a result of that disease.

occurred "6 hours to 12 to 24" before he became symptomatic—meaning that it could have occurred before Contreras was alone with him. Defense counsel argued that although he was not accusing Samantha of murdering her son, the evidence demonstrated she was alone with K.C. during the "window" of time when the injury could have occurred. And he maintained that the State had not presented any evidence to exclude the possibility that she, rather than Contreras, caused K.C.'s injuries.

Defense counsel also argued the State did not meet its burden of establishing that Contreras was guilty of knowingly causing injury to K.C. by omission based on his delay in calling for medical assistance after K.C. became symptomatic. He conceded that there was "plenty of evidence" showing Contreras did delay in calling for help but argued that, at most, the delay was "reckless."

## I. Jury charge and verdict

The trial court instructed the jury on three lesser-included offenses to the felony murder charge, explaining that if the jury did not find Contreras guilty of felony murder, it could find him guilty of the lesser-included offenses of injury to a child, by causing K.C.'s injuries either (1) intentionally or knowingly, (2) recklessly, or (3) with criminal negligence. The court also instructed the jury that although Contreras was charged with injury to a child by omission committed knowingly, it could find him guilty of the lesser-included offense of injury to a child by omission committed recklessly.

The jury found Contreras guilty of felony murder as charged in the indictment, as well as committing injury to a child by omission (knowingly). The jury sentenced him to 42 years for felony murder and 30 years for injury to a child by omission. The trial court ordered the sentences to run concurrently.

Contreras filed a motion for new trial, contending there was insufficient evidence to support the jury's verdict and he was denied his right to a fair trial because after trial one of the jurors revealed he served on the grand jury that initially indicted Contreras in 2020 on reckless injury to a child. Following an evidentiary hearing at which the juror testified, the trial court denied the motion. Appellant appeals from both judgments of conviction.

## II. ISSUES ON APPEAL

On appeal, Appellant raises five issues, contending: (1) the trial court erred in denying his motion for a directed verdict on the felony murder charge because the evidence was legally insufficient to support that charge; (2) the trial court erred in instructing the jury that it could use the offense of injury to a child as the underlying felony in a felony murder case; (3) the trial court erred in denying his motion for a directed verdict on the injury-to-a-child-by-omission charge because the evidence was legally insufficient to support that charge; (4) the trial court erred in failing to grant a new trial based on the allegation that a petit juror had also served on a grand jury that had previously indicted Appellant; and (5) his attorney violated his Sixth Amendment right to assert his innocence during closing argument by conceding his guilt to injury to a child by omission.

## III. INJURY TO A CHILD MAY SERVE AS THE UNDERLYING FELONY IN FELONY MURDER

We first address Contreras's Issue Two, in which he contends the jury charge on the felony murder count was in error for two related reasons: because it improperly instructed that injury to a child by act could be the underlying felony in felony murder and because it improperly allowed the State to use the same acts that constituted injury to a child to establish he committed an act clearly dangerous to human life that resulted in K.C.'s death in the commission of that offense to support his felony murder conviction.

21

### A. Standard of review

"A jury-charge-claim analysis involves two steps: First, we determine whether the charge is erroneous. If it is, then we must decide whether the appellant was harmed by the erroneous charge." *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022) (citing *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013); *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005) (en banc)). Here, we find that there was no error in the jury charge. Therefore, we need not conduct a harm analysis.

### B. The jury charge correctly stated the law on felony murder

The felony murder statute provides that a person commits murder if he

> commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

*Contreras v. State*, 312 S.W.3d 566, 583 (Tex. Crim. App. 2010) (quoting Tex. Penal Code Ann. § 19.02(b)(3)). To establish guilt, "the State must prove (1) an underlying felony, (2) an act clearly dangerous to human life, (3) the death of an individual, (4) causation (the dangerous act causes the death), and (5) a connection between the underlying felony and the dangerous act ('in the course of and in furtherance of . . . or in immediate flight from')." *Id.* at 583–84.

In the indictment, the State charged felony murder, using injury to a child as the underlying felony, alleging Contreras committed that offense by either inflicting blunt force trauma to K.C.'s head or shaking K.C. The State further alleged that, in the commission of injury to a child, Contreras committed an act clearly dangerous to human life, using those same acts, i.e., that he either inflicted blunt force trauma to K.C.'s head or shook K.C., resulting in his death. The trial court instructed the jury according to the indictment:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 1st day of March, 2020, in Winkler County, Texas, [Contreras] did then and there

commit or attempt to commit the felony offense of Injury to a Child, by intentionally, knowingly, recklessly, or with criminal negligence, causing serious bodily injury to [K.C.], a child younger than 14 years of age, by striking the head of [K.C.] with a blunt object, by causing the head of [K.C.] to strike a blunt object, or by causing the rapid acceleration or deceleration of the head of [K.C.], and while in the course of and in furtherance of the commission of said felony offense [Contreras] committed or attempted to commit an act clearly dangerous to human life; to wit, striking the head of [K.C.] with a blunt object, causing the head of K.C.] to strike a blunt object, or causing the rapid acceleration and deceleration of the head of [K.C.] which caused the death of an individual; namely, [K.C.], then you will find [Contreras] guilty of Felony Murder as charged in the indictment, and you do not need to consider whether [Contreras] is guilty of the lesser included offenses.

Without citing legal authority, Contreras first maintains the jury charge was in error because injury to a child cannot be the predicate felony in a felony murder case. As the State points out, his argument is contrary to well-established Texas law. "[U]nder the plain language" of the felony murder statute, "any felony can serve as the underlying felony" except manslaughter and lesser-included offenses of manslaughter, if the victim's death occurred during the commission of that felony. *See Johnson v. State*, 4 S.W.3d 254, 255 (Tex. Crim. App. 1999). Injury to a child is not a lesser-included offense of manslaughter. *Id.* at 258. Because injury to a child is not listed as an exclusion in the felony murder statute, it "can serve as the underlying felony for felony murder" if the child's death occurred as a result of the acts constituting injury to a child. *See Rodriguez v. State*, 454 S.W.3d 503, 507 (Tex. Crim. App. 2014), *on reh'g* (Feb. 25, 2015) ("It is established that an injury to a child offense may serve as the underlying crime in a felony murder prosecution.") (citing *Johnson*, 4 S.W.3d at 258; *Contreras*, 312 S.W.3d at 583–84).

Contreras argues that even if the State was entitled to use injury to a child as the predicate felony underlying the felony murder charge, it was not entitled to rely on the same alleged acts to establish both the predicate felony and that he engaged in an act "clearly dangerous to human life" that resulted in K.C.'s death. And, he contends, the jury charge erroneously failed to instruct the jury that the State was required to prove he committed a separate act that was clearly dangerous to

23

human life to support felony murder. Contreras's argument runs afoul of well-established Texas law. The Texas Court of Criminal Appeals has expressly held that in a felony murder prosecution, the same acts alleged to constitute the underlying felony offense of injury to a child may be used to support the allegation that the defendant engaged in acts clearly dangerous to human life. *See Johnson*, 4 S.W.3d at 254–58 (recognizing that "a defendant may be convicted of the offense of felony murder when the underlying felony is injury to a child and the acts that constitute that offense are the same acts that constitute 'an act clearly dangerous to human life'").

Urging us to reach a different result, Contreras relies on *Rodriguez*, 454 S.W.3d at 507. *Rodriguez*, however, is inapposite, as it involved a situation in which the State attempted to use an "omission," rather than an "act," to establish the defendant's guilt of felony murder. There, the defendant was charged with felony murder in the death of her seven-week-old baby who died from malnutrition and dehydration, using the offense of injury to a child as the underlying felony offense. *Id*. at 505. The court noted that although injury to a child may be committed by either an act or an omission, "the felony murder statute makes clear that an 'act clearly dangerous to human life' must be the cause of the death of the victim." *Id*. (citing Tex. Penal Code Ann. §§ 19.02(b)(3), 22.04(a)). The State never alleged the defendant committed any acts that were clearly dangerous to human life, nor was there any evidence that she committed any such affirmative acts. *Id*. The court therefore held that this element of the offense of felony murder was not met. *Id*. at 507–08.

In contrast, here the State's theory of guilt was that Contreras committed affirmative *acts* (inflicting blunt force trauma to K.C.'s head or shaking him) that constituted injury to a child and were also clearly dangerous to human life, resulting in K.C.'s death. The jury was properly instructed that if it found that he committed one of those acts, it could find him guilty of felony murder.

Contreras's Issue Two is overruled.

## IV. The Evidence was Legally Sufficient to Support Felony Murder

Having concluded that the trial court properly instructed the jury on the elements of felony murder, we turn to Contreras's first issue on appeal in which he argues the trial court erred by not granting his motion for directed verdict because the State's evidence was legally insufficient for the jury to find him guilty of felony murder. Contreras contends the State presented insufficient evidence to establish that he was the one who caused K.C.'s injuries and to rule out the possibility that Samantha was the responsible person. According to Contreras, the jury would have had to speculate to conclude that he, rather than Samantha, caused K.C.'s injuries, and he maintains that his judgment of conviction for felony murder should therefore be reversed.[14]

### A. Standard of review and applicable law

We review a trial court's ruling on a motion for directed verdict as a challenge to the legal sufficiency of the evidence. *See Canales v. State*, 98 S.W.3d 690, 693 (Tex. Crim. App. 2003) (treating defendant's argument that the trial court erred by denying his motion for a directed verdict as a challenge to the legal sufficiency of the evidence). In reviewing the legal sufficiency of the evidence to support a criminal conviction, we review the evidence in the record in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *see also Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (establishing legal sufficiency under *Jackson v. Virginia* as the only standard for review of the

---

[14] In his motion for directed verdict, Contreras did not argue there was insufficient evidence to support the jury's verdict because of the State's alleged failure to sufficiently identify him as the person who caused K.C.'s injuries and/or its failure to exclude Samantha as the guilty party. However, because we treat Contreras's argument as a challenge to the sufficiency of the evidence, it was not necessary for him to raise this argument in his motion; we are required to "always address challenges to the [legal] sufficiency of the evidence" even if not raised in the trial court. *See generally Rankin v. State*, 46 S.W.3d 899, 901 (Tex. Crim. App. 2001) (recognizing that "[a] claim regarding sufficiency of the evidence need not be preserved for review at the trial level and is not waived by the failure to do so").

evidence). "On appeal, the same standard of review is used for both circumstantial and direct evidence cases." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Thus, "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Hooper*, 214 S.W.3d at 13).

In conducting our review, we "look at 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985) (en banc)). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts are sufficient to support the conviction." *Id*.

The factfinder is the sole judge of weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We therefore defer to the trier of fact to "resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper*, 214 S.W.3d 9, 13; *see also Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018). "The fact-finder is responsible for judging the credibility of witnesses and may find credible all, some, or none of the testimony that the witnesses give." *Romano v. State*, 610 S.W.3d 30, 34 (Tex. Crim. App. 2020) (citing *State v. Ross*, 32 S.W.3d 853, 857 (Tex. Crim. App. 2000) (en banc)). We do not re-weigh evidence or substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Thus, "[w]hen the record supports conflicting inferences, a reviewing court must 'presume that the factfinder resolved the conflicts in favor of the prosecution' and defer to that determination." *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) (citing *Jackson*, 443 U.S. at 326).

26

"For the evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with the defendant's guilt." *Id*.; *see also David v. State*, 663 S.W.3d 673, 678 (Tex. Crim. App. 2022) (the evidence need not negate every conceivable alternative to a defendant's guilt to be sufficient). We therefore do not consider whether "possible alternative explanations" could support a finding that the defendant was not guilty; instead, our only focus is on "whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all of the evidence when considered in the light most favorable to the verdict." *Wise*, 364 S.W.3d at 903 (citing *Hooper*, 214 S.W.3d at 13).

## B. Applicable law

Because "[f]elony murder is an unintentional murder committed in the course of committing a felony," *Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004) (en banc), the State must prove the elements of the underlying felony (including the culpable mental state); but as to the resulting murder, no culpable mental state is required. *Lomax v. State*, 233 S.W.3d 302, 306–07 (Tex. Crim. App. 2007). "Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). A person commits injury to a child in scenarios such as the one before us "if he intentionally, knowingly, recklessly, or with criminal negligence[] by act . . . causes to a child . . . (1) serious bodily injury; (2) serious mental deficiency, impairment, or injury; or (3) bodily injury." Tex. Penal Code Ann. § 22.04(a). A child, for the purposes of this offense, is a person 14 years old or younger. *Id.* § 22.04(c)(1). The culpable mental state may be inferred from the acts of the accused or the surrounding circumstances, which include words and conduct. *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984).

## C.    Analysis

Although during trial Contreras initially sought to raise an inference that K.C.'s injuries resulted from preexisting conditions, he appears to concede on appeal, as his attorney did during closing argument, that K.C.'s injuries resulted from some form of trauma to K.C.'s head. The argument before us focuses solely on whether the State presented legally sufficient evidence to support the jury's finding that Contreras was the one who inflicted the trauma on K.C. Stated otherwise, he questions whether the State presented sufficient evidence to exclude Samantha as the one who committed the acts responsible for K.C.'s injuries.

In making this argument, Contreras finds it significant that his attorney asked each of the medical witnesses at trial whether they could determine if K.C.'s injuries were caused by a male or a female, and they unanimously responded in the negative. Contreras further points to Greenberg's testimony that she could not rule out the possibility that Samantha caused K.C.'s injuries and ultimate demise. But as the witnesses explained in their testimony, it was not their role to determine who caused K.C.'s injuries; the treating physicians were there to try to save K.C.'s life, while the medical examiner was tasked with determining how K.C. died. Accordingly, their failure to identify the perpetrator does not render the evidence legally insufficient.

Contreras also claims the only evidence presented at trial that Samantha did not cause K.C.'s injuries came from her own self-serving testimony. Given its self-serving nature, he contends, her testimony had "no evidentiary value."[15] Contreras then concludes that because there

---

[15] Contreras also argues Samantha's testimony was "tainted" because Cogburn shared a copy of Contreras's written statement before she made her own statement to the investigators, which he complains was improper. At trial, his attorney criticized law enforcement's investigation, also faulting them for not considering Samantha as a possible suspect, for failing to collect her cell phone, and for failing to collect other evidence from the family's residence in a timely manner. It was the jury's role to consider these alleged deficiencies in law enforcement's investigation in determining whether the State met its burden of proving Contreras's guilt. Our role is limited to determining whether the State presented sufficient evidence to support the jury's finding of guilt; we therefore do not review the "sufficiency of the police investigation" or speculate about what evidence law enforcement might have uncovered had it conducted the investigation differently. *See Badger v. State*, No. 02-18-00475-CR, 2019 WL 5089761, at *5 (Tex. App.—Fort Worth Oct. 10, 2019, pet. ref'd) (mem. op., not designated for publication) (citing *Delbrey v. State*,

was no other direct evidence to exclude Samantha as the guilty party, the State failed to meet its burden of proving beyond a reasonable doubt that he was guilty of causing K.C.'s injuries. There are several problems with this argument.

Though Contreras contends Samantha's testimony had no "evidentiary value," he cites no authority for that proposition. And the law in this context holds otherwise. A jury is free to determine the credibility of a witness's testimony, and the jury may therefore believe a witness's testimony even if it may be considered "self-serving." *See Jackson v. State*, No. 03-18-00417-CR, 2020 WL 2203306, at *3 (Tex. App.—Austin May 6, 2020, pet. ref'd) (mem. op., not designated for publication) (rejecting appellant's claim that the jury could not rely on a witness's testimony given its "self-serving" nature, as it was within the jury's exclusive province to determine the witness's credibility); *see also Steele v. State*, No. 01-06-00714-CR, 2007 WL 4465583, at *3 (Tex. App.—Houston [1st Dist.] Dec. 20, 2007, pet. ref'd) (mem. op., not designated for publication) (rejecting appellant's claim that witness's "self-serving" testimony was outweighed by his and other witness's testimony, as it was within the jury's province to determine who to believe).

Additionally, the record contains ample other circumstantial evidence upon which the jury could rely in inferring that Contreras caused K.C.'s injuries. *See Weaver v. State*, No. 02-10-00333-CR, 2011 WL 4345292, at *7–8 (Tex. App.—Fort Worth Sept. 15, 2011, pet. ref'd) (mem. op., not designated for publication) (rejecting appellant's argument that there was legally insufficient evidence to support his conviction because there was no "direct evidence" proving that

---

Nos. 05-18-00790-CR, 05-18-00791-CR, 2019 WL 3773851, at *4 (Tex. App.—Dallas Aug. 12, 2019, no pet.) (mem. op., not designated for publication) ("Our review concerns the sufficiency of the evidence presented at trial . . . rather than the sufficiency of the police investigation, and we do not speculate about evidence the State did not present."); *see also Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012) (concluding that appellate court "improperly used a 'divide and conquer' approach, separating each piece of evidence offered to support Appellant's conviction, followed by speculation on the evidence State did not present").

he was the "guilty party" where the State presented ample circumstantial evidence to support an inference that he committed the offense). Proving the cause of a child's injury or death "often depends on circumstantial evidence because 'there is rarely direct evidence of exactly how the child's injuries occurred.'" *See Cardenas v. State*, No. 08-20-00053-CR, 2022 WL 1284540, at *4 (Tex. App.—El Paso Apr. 29, 2022, no pet.) (not designated for publication) (citing *Williams v. State*, 294 S.W.3d 674, 683 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd)). Thus, as Contreras acknowledges, when a child is injured in the absence of any witnesses, the critical issue often comes down to timing and who had access to the child at the time of the injuries.

Significant to our sufficiency review, "Texas case law is replete with holdings that when an adult defendant has had sole access to a child at the time its injuries are sustained, the evidence is sufficient to support a conviction for injury to a child, or murder if the child dies." *Garcia v. State*, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref'd). While Contreras does not deny he had sole access to K.C. when he became symptomatic, he highlights that Samantha was admittedly alone with the child the same morning from the time she and K.C. woke up at 8:00 until she left for the store at 11:00—approximately an hour before K.C.'s symptoms appeared. And because Igbaseimokumo testified at trial that, based on the extent of deterioration in K.C.'s brain, he believed K.C.'s injuries occurred "6 hours to 12 to 24" before he became symptomatic, K.C. could have been injured earlier that morning while in Samantha's care. However, as set forth above, the three other medical experts who testified at trial disagreed with Igbaseimokumo's opinion. They believed that a child with the type of injuries K.C. suffered would have become symptomatic almost immediately after he was injured. Accordingly, the jurors were free to discount Igbaseimokumo's conflicting testimony and instead give credence to the other physicians' testimony whose timeline supported the State's theory that K.C.'s injuries occurred while Contreras had sole access to the child, and we are required to assume the jurors did just that.

*See Tena*, 2017 WL 3224961, at *7 (recognizing that where there was conflicting medical evidence regarding the timing of the child-victim's injuries,"[t]he jury was free to, and we must assume they did, discount the conflicting medical testimony that Appellant emphasizes to break the State's timeline"). Given the medical testimony regarding the timeline of K.C.'s injuries, a rational trier of fact could have concluded that K.C. was injured while he was in Contreras's sole care. *Id.*; *see also Cardenas*, 2022 WL 1284540, at *5–6 (upholding guilty verdict of injury of a child where medical testimony regarding the timeline of child's injuries supported a finding that defendant had sole access to the child at the time of the injuries and contradicted his theory that another individual was responsible for causing the injuries); *Gutierrez v. State*, No. 05-07-01330-CR, 2009 WL 1335154, at *3 (Tex. App.—Dallas May 14, 2009, pet. ref'd) (not designated for publication) (recognizing that where the jury heard medical evidence that, given the severity of the child's injuries, his symptoms would have immediately followed the injury, jury could infer defendant's guilt since he had sole access to the child at the time the child became symptomatic).

Moreover, as the State notes, the jury could have inferred Contreras's guilt based on the circumstantial evidence of his actions both before and after K.C. was injured. The week before K.C.'s injuries, Contreras sent Samantha a text message accusing her of cheating because she was not answer with the State that this supplies a motive for his actions in injuring K.C. And although motive is not an element of a crime, when the evidence suggests a defendant had both a motive and the opportunity to commit a crime, these can be "circumstances indicative of guilt." *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) (citing *Clayton v. State*, 235 S.W.3d 772, 781 (Tex. Crim. App. 2007) (recognizing that while motive is not an element of murder, "it may be a circumstance that is indicative of guilt")).

The evidence also suggests that before calling 911, Appellant changed K.C.'s clothes and his own shirt, which was later found to have blood stains on it matching K.C.'s DNA, and placed

the clothing items in a laundry hamper in K.C.'s room. From that, the jury could have inferred that K.C. bled onto Contreras's shirt after he was injured and that Contreras changed his clothes, placing the soiled shirt in the hamper in an attempt to conceal his crime. It is well-established that attempts to conceal a crime are generally probative of guilt. *See Guevara*, 152 S.W.3d at 50 (recognizing that "[a]ttempts to conceal incriminating evidence . . . are probative of wrongful conduct and are also circumstances of guilt"); *see also Tezino v. State*, 765 S.W.2d 482, 485 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd) ("Concealment of pertinent evidence supports an inference of guilty knowledge by the appellant as to such evidence.").

In addition, in the hours and days after K.C. was injured, Contreras provided inconsistent and improbable stories regarding K.C.'s symptoms and injuries. First, Contreras told the first responders that K.C. had been choking. Then, after medical personnel determined K.C. had no obstruction in his airway and no food in his stomach, Contreras changed his story to claim that K.C. had a seizure. Although Contreras informed the UMC physicians and CPS investigators that K.C. had vomited while he was bottle-feeding him, he did not mention this in any of his other statements. Moreover, when Cogburn responded to the 911 call, she did not see any evidence of vomit on K.C.'s clothes or on the couch where K.C. was laying, nor did she observe a bottle in the room. Finally, although Contreras initially claimed he immediately tried to call for help when K.C. became symptomatic, he later changed his story and stated his cell phone died and he had to wait to call for assistance until he could charge it—a statement that was later found to be false based on forensic testing of his phone.

"[I]nconsistencies in a defendant's story can provide evidentiary support for a conviction." *Nisbett*, 552 S.W.3d at 266; *see also Kemmerer v. State*, 113 S.W.3d 513, 515 (Tex. App.— Houston [1st Dist.] 2003, pet. ref'd) (recognizing that jury could consider defendant's improbable explanation for how child was injured and his "changing versions" for how the injury occurred as

32

evidence of guilt); *Gutierrez*, 2009 WL 1335154, at *3 (recognizing that "[i]nconsistencies between a defendant's version of events and the medical evidence concerning how an injury must have been inflicted can also be circumstantial evidence of guilt"). As well, false statements made by a defendant to cover up his crime evince a consciousness of guilt and may support a finding of guilt. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (en banc) (recognizing that a defendant's conduct in making false statements shows a consciousness of guilt and may be considered as circumstantial evidence of guilt); *see also Ziegler v. State*, No. 08-09-00188-CR, 2011 WL 810060, at *8 (Tex. App.—El Paso Mar. 9, 2011, no pet.) (not designated for publication) (recognizing that a defendant's conduct in lying to law enforcement reflects a consciousness of guilt, which may be considered as circumstantial evidence of guilt); *see also Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.) (recognizing that defendant's conduct after crime indicating consciousness of guilt is "one of the strongest kinds of evidence of guilt").

Accordingly, we conclude that the cumulative force of the evidence, when viewed in the light most favorable to the verdict, was legally sufficient to allow the jury to determine that Contreras was the person responsible for inflicting the injuries on K.C. that resulted in his death. The trial court therefore did not err in denying Contreras's motion for a directed verdict on the felony murder offense.

Appellant's Issue One is overruled.

## V. THE EVIDENCE WAS NOT LEGALLY SUFFICIENT TO SUPPORT INJURY TO A CHILD BY OMISSION

In Issue Three, Contreras contends the trial court erred in denying his motion for a directed verdict, which he maintains was made on the ground that the evidence was insufficient to support a finding of guilt on injury to a child by omission. Although we find nothing in the record to

suggest that Contreras made a directed verdict on this basis, we treat this issue as a challenge to the legal sufficiency of the evidence.[16]

As set forth above, Contreras was charged by indictment with "knowingly, by omission, caus[ing] serious bodily injury to [K.C.] . . . by failing to seek medical care for [K.C.] in a timely manner, and [Contreras] as a parent of [K.C.] had a legal duty to act pursuant to Section 151.001 of the Texas Family Code." Contreras does not deny a legal duty to act based on being K.C.'s father; however, he contends the State failed to present legally sufficient evidence to establish that his approximate ten-minute delay in calling for assistance created a greater risk of serious bodily injury to K.C. than K.C. already faced as the result of his injuries, as necessary to support his conviction for injury to a child by omission. Because the State proved and the jury found that Contreras caused K.C.'s death by his affirmative acts of injuring the child, the State did not establish that K.C. suffered a separate injury or any greater harm as the result of Contreras's delay in seeking medical treatment for those same fatal injuries.

A. Standard of review and applicable law

We apply the same *Jackson v. Virginia* standard of review set forth above for determining whether there was legally sufficient evidence to support a finding that Contreras was guilty of injury to a child by omission based on his delay in calling for medical assistance.

As it relates to Contreras's case, Texas Penal Code § 22.04 provides, "[a] person commits an offense if he . . . intentionally, knowingly, or recklessly by omission, causes to a child . . . serious bodily injury[.]" Tex. Penal Code Ann. § 22.04(a)(1). In turn, serious bodily injury is defined as "bodily injury that creates a substantial risk of death or that causes death, serious disfigurement, or protracted loss or impairment of the function of any bodily member or organ."

---

[16] *See generally Rankin*, 46 S.W.3d at 901 (recognizing that "[a] claim regarding sufficiency of the evidence need not be preserved for review at the trial level and is not waived by the failure to do so").

*Johnston v. State*, 150 S.W.3d 630, 638 (Tex. App.—Austin 2004, no pet.) (citing Tex. Penal Code Ann. § 1.07(a)(46)).

To support a conviction for injury to a child by omission, it is not enough for the State to present evidence that the defendant "failed to provide medical care *for* a serious bodily injury"; instead, the State must "prove that the child suffered serious bodily injury *because* the defendant failed to provide medical care" (emphasis in original). *See Johnson v. State*, Nos. 13-15-00461-CR, 13-15-00462-CR, 2017 WL 4684177, at *5 (Tex. App.—Corpus Christi Oct. 19, 2017, pet. ref'd) (mem. op., not designated for publication) (citing *Dusek v. State*, 978 S.W.2d 129, 133 (Tex. App.–Austin 1998, pet. ref'd)); *see also Payton v. State*, 106 S.W.3d 326, 329 (Tex. App.—Fort Worth 2003, pet. ref'd) (recognizing same). Thus, a defendant cannot be convicted of causing serious bodily injury to a child by omission for failing to seek medical treatment for a child's injuries unless the State establishes that the omission caused the child to suffer a serious bodily injury "above and beyond" the child's initial injuries. *See Desormeaux v. State*, 362 S.W.3d 233, 241 (Tex. App.—Beaumont 2012, no pet.) (citing *Johnston*, 150 S.W.3d at 637) (holding that a conviction for injury to a child causing serious bodily injury by omission for failing to seek timely medical treatment for an injured child requires evidence that the "failure to seek medical treatment created a substantial risk of death above and beyond that resulting from the initial injuries"). Stated otherwise, the delay in treatment must have "caused a separate injury, even if the separate injury was a worsening of the child's condition." *Cyr v. State*, 665 S.W.3d 551, 561 (Tex. Crim. App. 2022) (citing *Dusek*, 978 S.W.2d at 133 (holding that evidence was insufficient to sustain defendant's conviction for injury to a child by omission based on defendant's delay in obtaining medical treatment for his son's broken leg where there was no evidence the delay aggravated the seriousness of the child's injury or hindered his recovery)); *see also Johnson*, 2017 WL 4684177, at *4 (recognizing that a defendant could not be held criminally responsible for failing to seek

medical care for child's underlying injury unless the failure to seek care resulted in a "separate and discrete, or at least incrementally greater" injury to the child); *Villanueva v. State*, 227 S.W.3d 744, 748 (Tex. Crim. App. 2007) (recognizing, within the context of a double jeopardy analysis, that a defendant may only be held criminally responsible for both causing a child's injury and failing to seek medical care for the same injury if the failure to seek care resulted in a "separate and discrete, or at least incrementally greater" injury to the child than the one for which the defendant had already been held criminally responsible).

## B. Analysis

In arguing it presented sufficient evidence to support Contreras's conviction for injury to a child by omission, the State contends the record clearly establishes that Contreras knew K.C. needed urgent medical care yet admittedly delayed calling 911.[17] The State appears to be arguing that this fact alone constitutes sufficient evidence from which a jury could have found Contreras guilty of injury to a child by omission based on his failure to timely seek medical treatment for K.C. However, the State also has the burden of establishing that Contreras's delay caused K.C. to suffer a separate or greater injury than he already suffered as the result of his initial injuries.[18]

---

[17] Contreras, by his own admission, waited approximately ten minutes after K.C. became symptomatic and stopped breathing before calling for help. Because K.C. had severe symptoms and was not breathing when the medical responders arrived, the medical witnesses testified, his urgent need for medical treatment would have been evident.

[18] The State cites two cases for the proposition that a jury may rely solely on evidence that a defendant failed to seek medical care for a child in his care after observing the child in a quickly deteriorating state in finding him guilty of injury to a child by omission; but as Appellant points out, in both cases, there was evidence from which a jury could have inferred that the defendant's delay in seeking treatment for the injuries created a greater risk of injury or death to the child. *See, e.g.*, *Payton*, 106 S.W.3d at 330 (finding sufficient evidence to support a conviction for injury to a child by omission where the evidence demonstrated that the defendant, who had emergency medical training, observed his grandson suffering from visible signs of physical distress but nevertheless delayed seeking treatment, where one of the child's treating physicians stated it was possible the child would have survived if he had received medical care shortly after the injury occurred); *Desormeaux*, 362 S.W.3d at 241 (affirming defendant's conviction for capital murder and injury to a child by omission where there was evidence that defendant observed his infant son in a state of obvious physical distress and was informed by his son's stepmother that the child was in need of immediate emergency medical attention yet failed to seek any treatment for the child, who passed away as the result of his injuries, creating an inference that the delay increased the child's risk of death).

None of the State's medical witnesses testified that K.C. suffered any injury due to the delay in seeking treatment beyond that which Contreras's actions caused him, nor did they testify to the possibility that K.C. could have been saved had he received treatment sooner. *See Johnson*, 2017 WL 4684177 at *4–5 & n.5 (defendant could not be convicted of injury to a child by omission for delay in seeking treatment for her child's neck injury where there was no evidence to support a finding that the child suffered greater injury due to the delay); *Cf. Payton*, 106 S.W.3d at 330 (finding sufficient evidence to uphold a defendant's conviction for injury to a child by omission where medical witness testified that it was possible the child victim would have survived if he had received medical care in a timely manner); *Francis v. State*, No. 07-12-00238-CR, 2013 WL 5043014, at *4 (Tex. App.—Amarillo Sept. 12, 2013, pet. ref'd) (mem. op., not designated for publication) (upholding defendant's conviction for injury to a child by omission where expert testimony indicated that the defendant's decision to forego medical treatment for her child over the course of several days "caused or theoretically caused greater trauma to the child"). Instead, they testified in general terms that when a child has stopped breathing or is otherwise exhibiting symptoms of a brain injury, obtaining prompt medical care is a significant factor in the child's survivability.

Even if this generalized medical testimony could support an inference that Contreras's delay in seeking treatment for K.C. resulted in a greater risk of harm, the State's argument suffers from a more fundamental problem. As set forth above, the State charged Contreras with felony murder, using injury to a child by his acts as the predicate felony, alleging he committed acts that were clearly dangerous to human life, including "causing the rapid acceleration and deceleration" of K.C.'s head, which caused K.C.'s death. At the same time, the State charged Contreras in a separate indictment with injury to a child by omission, alleging his delay in seeking treatment for K.C.'s injuries caused him "serious bodily injury." Thus, oddly, the charging document alleged

37

Contreras's affirmative acts resulted in K.C.'s death, while Contreras's omission resulted in K.C.'s serious bodily injury. In finding him guilty of felony murder, the jury necessarily found that Contreras's acts caused K.C.'s death. Given the jury's finding, we conclude that the State did not, and could not, meet its burden to establish that Contreras's omission—his delay in seeking medical treatment for K.C.—caused K.C. to suffer a separate or greater injury than death.[19]

Accordingly, we agree with Contreras that the State did not present legally sufficient evidence from which the jury could have found him guilty of the offense of injury to a child by omission.

Contreras's Issue Three is sustained.[20]

## VI. THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S MOTION FOR NEW TRIAL

In Issue Five, Contreras contends the trial court erred in denying his motion for new trial, which he filed after learning that one of the jurors served on a grand jury that initially indicted him in 2020 for reckless injury to a child. According to Contreras, the juror's failure to disclose that

---

[19] We also recognize the possibility that Contreras's convictions for both injury to a child by his acts as the predicate felony in felony murder and his conviction for injury to a child by omission due to his failure to seek timely medical treatment could arguably constitute a double jeopardy violation. *See Johnson v. State*, Nos. 13-15-00461-CR, 13-15-00462-CR, 2017 WL 4684177, at *4 (Tex. App.—Corpus Christi Oct. 19, 2017, pet. ref'd) (mem. op., not designated for publication) (recognizing that when "a parent shakes a baby (affirmative act) and then fails to seek medical care after shaking the baby (omission)—causing a single injury (shaken-baby syndrome)," the defendant cannot be convicted of both offenses) (citing *Villanueva v. State*, 227 S.W.3d 744, 748 (Tex. Crim. App. 2007) (holding that the double jeopardy prohibition against multiple punishments precludes punishing a defendant for both his act in shaking baby and his omission in failing to seek medical help where only one injury occurred)); *see also Almaguer v. State*, 492 S.W.3d 338, 346 (Tex. App.—Corpus Christi 2014, pet. ref'd) (accepting State's concession that defendant could not be convicted of both murder in her son's death caused by blunt force abdominal trauma and the offense of injury to a child by omission for her failure to seek prompt medical attention for her son's injuries); *Ramirez v. State*, No. 11-15-00239-CR, 2018 WL 827148, at *5–6 (Tex. App.—Eastland Feb. 8, 2018, pet. ref'd) (mem. op., not designated for publication) (recognizing that a defendant may not be convicted of both injury to a child by inflicting fatal injuries and the offense of injury to a child by omission based on the defendant's failure to seek medical treatment for the child for those same injuries) (citing *Villanueva*, 227 S.W.3d at 748).

[20] Because we sustain Contreras's third issue, we need not reach his fourth issue in which he contends his trial counsel violated his Sixth Amendment right to maintain his innocence on the offense of injury to a child by omission.

fact prevented Contreras from being able to challenge the juror for cause, and he was therefore deprived of his right to a fair and impartial trial.

## A. Background

During voir dire, neither party asked the venirepersons if they had previously served on the grand jury that had indicted Contreras, or if they had served on any grand jury for that matter, and none of them volunteered that they had so served. After the jury returned its verdict and assessed punishment, however, the trial court informed the prosecutor and defense counsel that while speaking with the jury following the verdict, juror D. Dempsey disclosed having served on a grand jury that previously indicted Contreras. Contreras then filed a motion for new trial based on Dempsey's failure to disclose his prior grand jury service, citing to the trial court's discretion to grant a new trial in the "interest of justice" to protect a citizen "against the illegal or oppressive verdicts of prejudiced, careless, or ignorant juries."[21] *See State v. Gonzalez*, 855 S.W.2d 692, 694 (Tex. Crim. App. 1993) (en banc) (recognizing that "[t]he discretion of the District Court, in granting new trials, is almost the only protection to the citizen against the illegal or oppressive verdicts of prejudiced, careless, or ignorant juries, and we think the District Court should never hesitate to use that discretion whenever the ends of justice have not been attained by those verdicts").

The trial court held a hearing on the motion, at which Dempsey testified, acknowledging he served on a grand jury empaneled in 2020 that handed up the first indictment in Contreras's case for reckless injury to a child. He averred, however, that he did not make the connection between his prior grand jury service and Contreras's case until Thursday evening—the day before

---

[21] Appellant also argued in his motion that he was entitled to a new trial on the ground that the verdict was contrary to the evidence.

deliberations—when he realized Contreras's name sounded familiar. He maintained that he did not realize he was required to disclose the information to anyone prior to deliberations.[22]

Dempsey testified that, although he recalled Contreras's name as a person the grand jury indicted, he did not recall any information regarding Contreras's case or the nature of the evidence the State presented given that much time had passed and grand jury heard "a lot of different cases" that year (even though he acknowledged that this may have been the only case the grand jury heard that year involving a death). Dempsey further testified that he did not disclose his grand jury service to the other jurors during their deliberations or share any other information with them regarding his grand jury service. Finally, he testified that he based his verdict solely on the evidence and the witnesses' testimony presented during trial.

Following his testimony, defense counsel argued Dempsey was required to disclose that he had served on the grand jury, and had he done so prior to deliberations, he could have challenged Dempsey for cause and the trial court could have seated one of the two alternate jurors to deliberate in his place.[23] The State, however, argued Dempsey was not required to disclose his prior grand jury service absent being asked questions regarding the same during voir dire. The State found it significant that Dempsey only served on the 2020 grand jury that indicted Contreras for reckless injury to a child, which was later dismissed, and Dempsey did not serve on the 2023 grand jury that indicted him on the charges for which he stood trial. Finally, the State argued Contreras failed to establish that Dempsey harbored any bias against him due to his prior grand jury service, given Dempsey's testimony that he did not recall the evidence he heard in that proceeding and was not influenced by his prior grand jury service in reaching his verdict.

---

[22] Dempsey testified that in retrospect, he recognized that he "probably should have" disclosed the information prior to deliberations.

[23] The record reflects that there were two alternate jurors available to deliberate.

After taking the motion under advisement, the trial court denied the motion, making express findings of fact and conclusions of law. First, the trial court found Dempsey's testimony credible that (1) he did not realize he had served on the grand jury that indicted Appellant for reckless injury to a child until approximately the punishment stage of trial, (2) he did not recall any of the evidence presented to the grand jury on that indictment, (3) he did not share with the jurors his involvement with the grand jury until the judge "talked with the jurors after their service had ended," (4) his "prior grand jury service did not influence any of his petit jury decisions," and he was not biased against Appellant, and (5) "he based them solely on the evidence heard at trial." The court further found that Dempsey did not intentionally withhold his grand jury service from the parties during voir dire, as the parties failed to ask the panel any questions about their prior grand jury service. The court concluded that Contreras forfeited his right to challenge Dempsey for cause due to his failure to ask any such questions.

## B. Standard of review

An appellate court reviews a trial court's denial of a motion for new trial for an abuse of discretion, viewing the evidence in the light most favorable to the ruling and reversing only if no reasonable view of the record could support the ruling. *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017). In determining whether the trial court abused its discretion, an appellate court must not substitute its own judgment for that of the trial court, and it must uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Id*. (citing *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012); *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007)).

## C. Applicable law

Texas Code of Criminal Procedure Article 35.16(a)(7) provides that a party may make a challenge for cause to a juror by "alleging some fact which renders the juror incapable or unfit to

serve on the jury." Tex. Code Crim. Proc. Ann. art. 35.16(a). Several challenges may be made by either party, to include a challenge because "the juror served on the grand jury which found the indictment" in the defendant's case. *Id*. art. 35.16(a)(7). "The statute makes sitting on a grand jury a cause for challenge due to the fear that a person who served on the grand jury which returned the indictment may have formed an opinion in the case that was adverse to the appellant." *Webb*, 232 S.W.3d at 113. If properly and timely raised, a juror who previously served on a grand jury should be excused. *See, e.g.*, *Graham v. State*, 258 S.W.3d 201, 204 (Tex. App.—Waco 2008, no pet.) ("It is error for a trial court to overrule a challenge for cause to a panelist who was a member of the grand jury that returned the indictment being tried") (citing *Wolfe v. State*, 178 S.W.2d 274, 279 (Tex. Crim. App. 1944) (holding that trial court should have sustained defense counsel's challenge for cause against juror who served on the grand jury which found the indictment)).

While serving on the grand jury that indicted the defendant provides a ground for a party to challenge the juror, it "is not an absolute disqualification" from sitting on a petit jury. *See Webb*, 232 S.W.3d at 112; *see also Graham*, 258 S.W.3d at 204 (recognizing that serving on a grand jury is not an absolute disqualification). Therefore, defense counsel is required to question the panel regarding whether they previously served on a grand jury—and in particular whether they served on the grand jury that indicted the defendant—or the defendant will forfeit his right to later challenge the juror's service. *Webb*, 232 S.W.3d at 112 (recognizing that a "challenge for cause is forfeited if not made"); *Self v. State*, 47 S.W. 26, 28–29 (Tex. Crim. App. 1898) (holding that having failed to question juror about his service on a grand jury, defendant cannot be heard to complain of his service for the first time on appeal); *Graham*, 258 S.W.3d at 204 (recognizing that "[t]he failure to question a juror about whether the juror was a member of the grand jury that returned the indictment constitutes a waiver of the right to thereafter complain that the juror was

disqualified on that basis"); *see also Mitchell v. State*, 27 S.W.2d 800, 800 (Tex. Crim. App. 1930) (recognizing same).

### D. Appellant forfeited his right to challenge Dempsey

Contreras seeks to blame Dempsey for failing to disclose his prior grand jury service, noting that the prosecutor asked the panel during voir dire whether they knew Contreras or had heard anything about the case.[24] Contreras contends these questions were sufficient to alert Dempsey that he was required to disclose his prior grand jury service.

As explained above, it is counsel's obligation to exercise due diligence in questioning the panel regarding any grounds for challenging a potential juror for cause or grounds that might reflect on their impartiality. *See Armstrong v. State*, 897 S.W.2d 361, 363–64 (Tex. Crim. App. 1995) (en banc) (recognizing defense "counsel's obligation to ask questions calculated to bring out that information which might be said to indicate a juror's inability to be impartial and truthful"). As the State points out, it is well-established that asking general questions regarding the panel's familiarity with the defendant or his case is insufficient to satisfy due diligence in discovering whether a juror previously served on a grand jury in the defendant's case.

The Court of Criminal Appeals examined this principle at length in *Webb*. There, the defendant argued that because his attorney asked the panel a general question regarding "familiarity about the case" and no one responded, he was not required to ask more specific questions about whether any of them had served on the grand jury that indicted him. *Webb*, 232 S.W.3d at 113. The court disagreed, holding that counsel is obligated to ask the venirepersons

---

[24] The prosecutor asked the venirepersons: "Anyone here know Sonny Contreras? You know the Defendant? Does that apply to anybody?" The question did not receive any apparent response. The prosecutor also asked the panel if "anyone here [had] heard anything in the community about this case? Anyone here heard of this?" One person responded that they knew of the case from working as a jailer and was later excused from the panel by agreement of the parties. Defense counsel did not ask any additional questions regarding the jury's familiarity with Contreras or his case.

specific questions regarding the various statutory grounds relevant to whether they may be disqualified or challenged for cause. *Id.* In imposing this requirement, the court recognized that "[t]he jury panel does not know the statutory challenges for cause and thus the prospective jurors likely do not know what the parties are trying to determine during voir dire" when they are asked only general questions about their familiarity with a case. *Id.* (citing *Self*, 47 S.W. at 26 (holding that merely asking the prospective jurors if they had "formed an opinion in the case" was insufficient to preserve error on the issue of whether the juror should have been excused for cause for his prior service on the grand jury)). The court therefore concluded that because defense counsel "did not ask specific enough questions to determine whether anyone on the panel had served on the grand jury that indicted him," he "forfeited the right to complain that the juror should have been excused." *Id.*

Similarly, our sister court held that defense counsel forfeited his right to challenge a juror for cause based on her prior service on the grand jury where the panel was only asked if anyone knew the defendant. *Graham*, 258 S.W.3d at 204–05. As the court recognized, "this was insufficient to satisfy the requirement that counsel must expressly inquire whether anyone had served on a grand jury, or the grand jury at issue." *Id*. at 205 (citing *Webb*, 232 S.W.3d at 112; *Hawkins v. State*, 135 S.W.3d 70, 76–77 (Tex. Crim. App. 2004) (en banc)).

Here, too, we conclude that general questions regarding whether the venirepersons knew Contreras or had heard of his case were insufficient to satisfy defense counsel's obligation to exercise due diligence in questioning the panel members about their prior grand jury service. Contreras therefore forfeited his right to later complain that Dempsey should have been excused for cause on this basis.[25]

---

[25]Even if Contreras had not forfeited his claim that Dempsey should have been excused from serving as a juror, Contreras did not establish that he was deprived of his right to a fair and impartial trial as the result of Dempsey's prior grand jury service. In *Webb*, the Court of Criminal Appeals recognized that the danger of allowing an individual

Appellant's Issue Five is overruled.

## VII. CONCLUSION

We affirm Contreras's conviction for felony murder. We reverse Contreras's conviction for injury to a child by omission and render a judgment of acquittal on that offense.

LISA J. SOTO, Justice

March 28, 2025

Before Salas Mendoza, C.J. Palafox and Soto, JJ.

(Do Not Publish)

---

who served on the grand jury that indicted the defendant to sit on a trial jury stems in part from the possibility that they "may have seen evidence that was inadmissible at trial, and may have formed a bias against the defendant prior to the beginning of the trial." *Webb v. State*, 232 S.W.3d 109, 114 (Tex. Crim. App. 2007). Here, Dempsey did not serve on the same grand jury that indicted Contreras on the current offense, and, more importantly, he testified that he did not recall any of the evidence presented at the grand jury; he did not tell the other jurors about his grand jury service; and his verdict was based solely on the evidence presented at trial. In denying Contreras a new trial, the court expressly found Dempsey's testimony to be credible and that he did not harbor a bias against Contreras due to his prior service on the grand jury. Accordingly, the trial court was free to conclude that Dempsey's service on the grand jury did not deprive Contreras of his right to a fair and impartial trial. *Id.* at 114 (upholding trial court's finding that defendant was not deprived of his right to a fair and impartial jury where juror who previously sat on the same grand jury that indicted the defendant testified she did not remember any facts or evidence that may have been presented to the grand jury and she was not biased against him).